**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TERESA C. MILLER,<br><br>Plaintiff,<br><br>v.<br><br>FOSTER CARE COALITION OF GREATER ST. LOUIS, INC., d/b/a FOSTER & ADOPTIVE CARE COALITION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. ________________<br><br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Teresa C. Miller, by counsel, brings this action against Foster Care Coalition of Greater St. Louis, Inc., doing business as Foster & Adoptive Care Coalition (the "Coalition"), and alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Teresa C. Miller ("Miller") is an individual residing in St. Clair County, Illinois.

2. Miller worked for the Coalition from August 22, 2022, until the Coalition terminated her employment on October 17, 2025.

3. Defendant Foster Care Coalition of Greater St. Louis, Inc. does business as Foster & Adoptive Care Coalition.

4. During Miller's employment, the Coalition operated an office at 1750 South Brentwood Boulevard, Suite 210, Brentwood, Missouri 63144; their current location is 1220 North Lindbergh Boulevard, St. Louis, MO 63132.

5. Miller worked at that office and remotely under a hybrid arrangement.

6. The Coalition recruits and supports foster and adoptive families in the St. Louis metropolitan area, including Missouri and Illinois.

7. Miller communicated with prospective caregivers and partner agencies in both states in performing her work.

8. On information and belief, the Coalition employed at least fifteen employees for each working day in at least twenty calendar weeks in 2024 or 2025 and was engaged in an industry affecting commerce.

9. Miller was an employee, and the Coalition was her employer, within the meaning of 42 U.S.C. § 2000e; their employment relationship included Miller's performance of recruiting services in exchange for compensation.

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

11. Jurisdiction over the Title VII claims also exists under 42 U.S.C. § 2000e-5(f)(3).

12. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3).

13. The challenged employment practices occurred at the Coalition's Missouri workplace in this District, and Miller would have continued working there but for the challenged termination.

14. The Coalition employed Miller and conducted the challenged employment activities in St. Louis County, Missouri, within the Eastern Division.

**ADMINISTRATIVE PROCEEDINGS**

15. Miller filed an administrative charge (the "Charge") against Foster & Adoptive Care Coalition, assigned EEOC Charge No. 560-2026-00321, digitally signing the charge under penalty of perjury on April 7, 2026. *Exhibit 1.*

16. By letter dated April 10, 2026, the Missouri Commission on Human Rights ("MCHR") confirmed that the Charge filed with the EEOC had also been filed with MCHR, identifying the matter as MCHR No. FE-04/26-40321. *Exhibit 2*.

17. The Charge identifies religion and retaliation and described Miller's religious objection to meetings, increased scrutiny of her work and hybrid schedule, workplace discussions about pronoun usage, isolation and exclusion, reports to HR, her October 15, 2025 grievance, and her October 17, 2025 termination.

18. On September 3, 2026, the EEOC issued a Determination and Notice of Rights on that charge, dismissing the Charge without determining whether further investigation would establish a statutory violation and notifying Miller of her right to sue. *Exhibit 3*.

19. Miller brings this action within ninety days of her receipt of the EEOC notice.

20. As of the filing of this Complaint, the MCHR has not issued Miller a separate notice of right to sue; Miller therefore does not presently assert a cause of action under the Missouri Human Rights Act ("MHRA").

21. Upon issuance of the MCHR notice, Miller intends to seek leave, as necessary, to amend or supplement this Complaint to assert those MHRA claims supported by her administrative charge and the facts alleged here, subject to applicable procedural and statutory requirements.

## FACTUAL ALLEGATIONS

### A. Miller's employment and positive performance appraisals

22. Miller served as the Coalition's General Recruiter, also identified in agency communications as Foster & Adoptive Home Recruiter.

23. In her role, Miller screened prospective caregivers, communicated with families, maintained recruitment information in Salesforce, and referred prospective caregivers for further services.

24. Miller is Black and a practicing Christian.

25. Miller is also an ordained minister and has been affiliated with her local church for many years.

26. At all relevant times, Karen Alyasiry ("Alyasiry") was the Director of General Recruitment and Family Development; in that role, Alyasiry supervised Miller and directed her work assignments, scheduling, and performance expectations.

27. At all relevant times, Cisely Beard ("Beard") was Senior Program Director of General and Targeted Recruitment and Alyasiry's senior supervisor.

28. At all relevant times, Sharon Winfield ("Winfield") served as Chief Human Resources Officer.

29. At all relevant times, Melanie Scheetz ("Scheetz") was the Executive Director of the Coalition.

30. At all relevant times, Denise Kelley ("Kelley") was the Chief Program Officer and participated in management and personnel meetings concerning Miller.

31. Alyasiry and Beard exercised authority over Miller's duties and working arrangements.

32. Miller successfully recruited and assisted families with beliefs and backgrounds different from her own.

33. Miller did not regard her Christian faith as preventing her from treating LGBTQ persons, coworkers, or families respectfully or providing services to them.

34. The initial appraisal prepared for the August 2023 through August 2024 review period recorded that Miller successfully met her performance goals; Miller did not receive a final copy bearing all management signatures.

35. On October 30, 2024, Alyasiry told Miller by email that she had done "amazing" on her evaluation and that Alyasiry had requested Beard's signature before providing Miller a copy.

36. At an October 7, 2025 team meeting attended by Miller, Beard, Alyasiry, and other relevant personnel, Alyasiry announced that Miller had met her performance goals for the fiscal year and praised her work as a "one-man team."

**B. Miller's religious beliefs, workplace discussions, and notice of religious objections**

37. Miller sincerely believes, as a matter of her Christian faith, that she should not place personal pronoun identifiers in her own email signature or on business cards.

38. Miller's objection to the use of personal pronoun identifiers concerned identifying herself in that manner; it was not a refusal to serve LGBTQ families.

39. During a mandatory, Coalition-sponsored sexual orientation, gender identity/ expression ("SOGIE") virtual training in October 2024, a presenter encouraged employees to include pronouns in email signatures and business cards and to display items supporting LGBTQ children and families.

40. After an HR representative explained that she did not include personal pronouns for religious reasons, Miller likewise explained her Christian objection and shared a Bible passage supporting her belief in the meeting chat.

41. Miller's co-workers responded verbally and in the chat by questioning whether employees with those beliefs could successfully do their jobs.

42. The discussion concerned Miller's expressed Christian belief and its asserted incompatibility with her recruiting work.

43. The Coalition continued the discussion in additional staff meetings that month.

44. Miller attended a continued-conversation meeting during the week of October 21, 2024, in which employees again questioned her ability to perform her role in light of the belief she had expressed.

45. Miller did not advocate harming LGBTQ people.

46. Miller did not post a passage declaring that gay people should be killed.

47. A passage concerning death was raised by another participant, and Miller disputed the use of that passage to characterize her own beliefs and conduct.

48. On October 30, 2024, Miller expressly told Alyasiry by email: "I strongly disagreed with some coworkers implying that I couldn't support families due to my faith."

49. Alyasiry responded that she was sorry and offered to discuss the matter.

50. Following these discussions, co-workers who had previously interacted with Miller stopped greeting or speaking to her.

51. Miller had multiple conversations with HR and senior management about feeling targeted and isolated because of her religious beliefs, rather than merely disagreeing with ordinary work instructions.

52. In or around June 2025, Scheetz announced at a staff meeting that the Coalition's initiatives related to diversity, equity, inclusion, and belonging ("DEIB") will continue despite federal and state governmental orders to the contrary.

53. In that same meeting, Scheetz also announced that employees would attend facilitated small group discussions "to own and define our temporary words that we will use until all this craziness ends."

54. In approximately early July 2025, Miller told Winfield that she was uncomfortable attending certain meetings because participation conflicted with her religion.

55. Miller explained the religious nature of the problem to HR.

56. No action resolving the religious conflict followed Miller's report to Winfield.

57. Miller's Christian beliefs include a duty, grounded in Romans 13:1–5, to obey governing authorities and not participate in efforts she understood to evade governmental mandates.

58. Miller believed meetings about continuing DEIB work through changes in terminology implicated that duty.

59. Despite Miller's communication to HR about the religious conflict, the Coalition continued to require her attendance and participation in the meetings.

60. During a mandatory virtual meeting about the continuation of the Coalition's DEIB work, Winfield also directed Miller to turn on her camera.

61. The Coalition provided Miller no alternative that resolved her identified religious conflict.

62. In September 2025, the Coalition again conducted staff discussions post-SOGIE training concerning pronoun usage and survey responses arising from the earlier dispute.

63. During a September 10, 2025 meeting, a person in a leadership role advocated that everyone use pronouns, and other participants argued that their use should not be optional.

64. Workplace survey results circulated during that same September 10 meeting included a response criticizing the continued employment of persons described as openly transphobic or homophobic and referring to a Bible passage about killing homosexuals.

65. Miller had not posted any such passage and understood the renewed discussions to associate her expressed Christian objection with hostility toward the families she served.

66. During Coalition-sponsored discussions, co-workers again questioned whether people with beliefs like Miller's should work at the Coalition.

67. Miller observed senior leaders reacting approvingly to comments challenging those beliefs.

68. Miller experienced the repeated discussions as singling her out, not as an isolated difference of opinion.

69. Miller reported this isolation and treatment to HR.

70. Miller also experienced anxiety and emotional distress, became reluctant to speak in staff discussions, and reserved separate rooms to perform her work away from the hostile interactions.

**C. Work assignments, scheduling, exclusion, and complaints**

71. Miller initially performed recruiting work under a flexible schedule; specifically, she ordinarily worked remotely on Wednesdays, Thursdays, and alternating Fridays and communicated with her supervisors about other remote-work needs.

72. In or around February 2025, Alyasiry informed Miller that in addition to her recruitment work, Miller would also be responsible for conducting additional background screening and licensing-related tasks—work that had been previously performed by four other licensing employees.

73. Miller requested clearer instructions and assistance because the added tasks were unfamiliar and substantially increased the workload she was required to complete.

74. On March 5, 2025, Miller requested HR's presence at a meeting with Alyasiry and Beard about the added licensing duties.

75. Beard declined to include HR at that stage.

76. Miller complained about workload, inconsistent directions, and lack of training and lack of assistance.

77. These working conditions became more difficult after the religious dispute and continued as Miller reported religiously targeted treatment.

78. On July 22, 2025, Beard authorized Miller to work from home that week because of vehicle problems but later characterized her in-office attendance as a matter of continued noncompliance.

79. Miller disputed that characterization because she had communicated her circumstances and understood the remote work to have been approved.

80. Following management discussions, Miller adopted a 7:30 a.m.–3:30 p.m. schedule with management's knowledge.

81. On September 17, 2025, Miller requested a three-business-day trial of arriving between 7:30 and 8:00 a.m.; Winfield approved the trial.

82. Alyasiry also expressly acknowledged those hours in an October 15, 2025 email.

83. In September 2025, Alyasiry took Miller's immediate team to a birthday lunch during work hours on one of Miller's in-office days.

84. Miller was not notified or invited, although the other team members were included.

85. When Miller reported her exclusion to Winfield in late September, Winfield responded in substance that Miller should make friends with co-workers if she wanted to be invited.

86. The exclusion deprived Miller of participation in a supervisor-organized team activity during the workday.

87. At a September 19, 2025 meeting about her complaints, Winfield and Beard told Miller that, as a Christian, she should forgive Alyasiry.

88. Miller had sought intervention concerning the treatment, but management invoked her religion to discourage her from pursuing a grievance.

89. On two occasions, Miller did not proceed with intended grievances following such discussions.

90. Nonetheless, management continued to scrutinize Miller's work and schedule while leaving her concerns unresolved.

**D. Opposition to racial harassment and the resulting grievance**

91. In approximately September 2024, Miller received a text on her work telephone containing the N-word.

92. Miller reported the message to management, including Alyasiry and Beard.

93. Miller was distressed by receiving a racial slur on a work device and was concerned that the sender might have a workplace connection.

94. The sender's identity and relationship to the Coalition were not established to Miller at that time.

95. An IT employee subsequently blocked the number from which the racial slur originated.

96. Miller continued receiving unidentified calls for a period afterward, but she could not establish the callers' identities or that all calls came from the same individual(s) who texted the racial slur to Miller.

97. On August 12, 2025, Alyasiry placed a stuffed monkey on the top of her cubicle wall, visible to Miller from Miller's workspace.

98. The stuffed monkey wore sunglasses; Miller had also worn sunglasses at her desk because of the bright office lighting.

99. Miller immediately notified Beard that she and a fellow Black co-worker found the stuffed monkey uncomfortable because of its racist history and connotation for Black people, and did not want to see it displayed at their supervisor's desk.

100. Miller sincerely and reasonably believed that, in the context of the earlier racial-slur text, the display implicated racial harassment in her workplace.

101. Miller reported that concern to a senior supervisor rather than remaining silent.

102. Beard removed the monkey promptly after Miller complained; however, the removal did not resolve the subsequent treatment directed at Miller for raising the concern.

103. After learning of Miller's complaint, Alyasiry (Miller's direct supervisor) filed a formal grievance against Miller for complaining about the stuffed monkey, insisting that Miller should have approached Alyasiry about the display first.

104. On August 19, 2025, Winfield notified Miller that Alyasiry had filed a formal grievance against her, and that Miller would report to Beard during the investigation.

105. Winfield investigated the statements in Miller's complaint, including her statement that the display was uncomfortable because of its racial connotation.

106. On September 11, 2025, Winfield concluded that Alyasiry had no racist intent and that the monkey had been immediately removed.

107. Miller does not rely on the Coalition's disagreement with her complaint, standing alone, as establishing retaliation.

108. Miller believes that Alyasiry's grievance in response to her report of race-based harassment, the ensuing focus on Miller's statements, subsequent exclusion and escalating scrutiny, and the eventual termination formed a retaliatory response to her opposition.

**E. Management's knowledge, Miller's final grievance, and termination**

109. On September 29, 2025, after a meeting with Alyasiry, Beard and Kelly that Miller experienced as hostile, she sought to speak with Scheetz.

110. Scheetz informed Miller that Winfield had briefed her on the situations, that she had seen the file, and that Miller should continue following the HR process.

111. Winfield separately acknowledged Miller's complaint of harassment that day, requested details and supporting communications, and described the anticipated investigation.

112. Miller continued seeking relief rather than abandoning her complaints.

113. On October 14, 2025, Miller reviewed her personnel file with Winfield.

114. Winfield told Miller that her file was clear of wrongdoing and confirmed that there was no signed receipt showing that Miller received the employee manual when hired.

115. Miller had first received the full manual on September 10, 2025.

116. On October 15, 2025, Miller submitted a formal written grievance against Alyasiry to HR concerning treatment she considered harassment and retaliation, following the earlier religiously specific complaints and written opposition to racial harassment and retaliation described above.

117. On October 16, 2025, Miller confirmed with HR that she had submitted the grievance the previous day and requested a different reporting supervisor and workspace while it was investigated and stated that the hostile environment was causing emotional or mental harm.

118. Winfield directed Miller to the Grievance Policy and stated that she would review the complaint and follow up.

119. Miller again requested guidance about being temporarily assigned to another supervisor and a change in workspace.

120. The Coalition had previously temporarily reassigned Miller to Beard while investigating Alyasiry's grievance against Miller, but did not provide the comparable temporary change Miller sought before terminating her employment.

121. On the morning of October 17, 2025, Scheetz took Miller to a room where Winfield was waiting and informed her that her employment was ending immediately.

122. When Miller asked why, Scheetz told Miller that she had done nothing wrong and praised Miller's work and performance with caregivers; Winfield referred to the Coalition's right to end at-will employment and stated that they felt they could not move forward together in the employment relationship.

123. Neither Scheetz nor Winfield provided any verbal or written notice to Miller during that meeting that she was being discharged for cause or in violation of any company policy.

124. At the October 17 termination meeting, the Coalition also presented Miller with a proposed severance and release agreement.

125. Miller did not sign it or agree to a mutual separation.

126. Termination of Miller's employment occurred two days after Miller filed a formal grievance against Alyasiry (her immediate supervisor) and one day after she repeatedly requested protection while the grievance was investigated.

127. In its May 27, 2026 EEOC position statement and supporting materials, the Coalition relied on alleged unauthorized remote work, attendance and performance concerns, insubordination concerning the respite inquiry, and allegations that Miller had harassed coworkers through religious communications.

128. The sequence of religiously focused criticism and exclusion, management's use of Miller's Christianity to discourage grievances, the response to Miller's racial harassment report, the decisionmakers' knowledge, Miller's recently praised performance, the timing of termination, and the difference between the explanation given at separation and the later-asserted reasons support the inference that the stated reasons to the EEOC were merely a pretext.

129. The Coalition's policies prohibited discrimination and retaliation, provided for religious accommodation, and addressed employee grievances.

130. Miller used management and HR channels to seek relief, but the Coalition terminated her rather than resolving her complaints.

131. As a direct result of the conduct alleged, Miller suffered loss of wages and employment-related benefits, impairment of her employment relationship, anxiety, humiliation, emotional distress, and other compensable injuries.

## COUNT I — RELIGIOUS DISCRIMINATION: DISPARATE TREATMENT
### Title VII, 42 U.S.C. § 2000e-2(a), (m)

132. Miller incorporates the preceding factual allegations.

133. Miller's sincerely held Christian beliefs and practices are protected by Title VII and were known to Alyasiry, Beard, Winfield, Kelley and Scheetz through her explanations, staff discussions, and complaints.

134. Miller was qualified to perform her recruiting position, had successfully served families of differing backgrounds, and had recently been praised for meeting her fiscal-year performance goals.

135. The Coalition subjected Miller to disadvantageous terms and conditions of employment, including exclusion from a supervisor-organized team activity during work hours, increased workloads and scrutiny linked to the religious dispute, and termination of her employment.

136. The statements challenging Miller's ability to work because of her Christian belief, management's responses to her complaints, the repeated religiously focused discussions, and the termination circumstances support an inference that Miller's religion was a motivating factor in those actions.

137. The Coalition's conduct violated Title VII and directly caused the injuries alleged.

138. Miller seeks the relief stated in the prayer, subject to the requirements and limitations applicable to this claim.

**COUNT II — RELIGIOUS HOSTILE WORK ENVIRONMENT**
**Title VII, 42 U.S.C. § 2000e-2(a)**

139. Miller incorporates the preceding factual allegations.

140. Miller was subjected to unwelcome conduct because of her Christian beliefs, including repeated challenges to her fitness for employment based on those beliefs, renewed staff discussions casting those beliefs as incompatible with her work, isolation and exclusion, and management's invocation of her faith to discourage complaints.

141. The conduct occurred through mandatory attendance at Coalition-sponsored trainings and recurring staff discussions from October 2024 into the fall of 2025, as well as through workplace interactions and management responses.

142. The religiously explicit statements, their repetition before co-workers, and their connection to Miller's job distinguish the conduct from ordinary disagreements about assignments.

143. Taken together, the conduct was sufficiently severe or pervasive to alter Miller's working conditions and create an objectively hostile environment.

144. Miller experienced the environment as hostile, suffered anxiety and distress, withdrew from staff discussions, and used separate rooms to avoid exposure while completing her work.

145. The Coalition knew of the conduct through the participation of management in the meetings and Miller's repeated reports to supervisors and HR.

146. The Coalition's responses did not effectively stop the conduct but instead hastened termination of Miller's employment.

147. The Coalition is responsible for the participation of its management personnel and for failing to take effective corrective action concerning the co-workers' conduct of which it had notice.

148. Such conduct directly caused Miller's injuries.

## COUNT III — RELIGIOUS DISCRIMINATION: DENIAL OF REASONABLE ACCOMMODATION
## Title VII, 42 U.S.C. §§ 2000e(j), 2000e-2(a)

149. Miller incorporates the preceding factual allegations.

150. Miller's sincerely held Christian practice required her to refrain from participating in conduct she understood to evade governmental requirements.

151. This duty arose from her religious beliefs concerning obedience to governing authorities, rather than merely a preference about office programming.

152. The Coalition's requirement that Miller attend and participate in meetings concerning continuation of the Coalition's DEIB work through changes in terminology conflicted with that religious practice.

153. Miller informed Winfield in approximately early July 2025 that attendance conflicted with her religion.

154. After that report, Miller was still required to attend the meetings, and the Coalition provided no accommodation resolving the conflict.

155. The Coalition continued to compel Miller's attendance and participation, including requiring her camera to be on during a virtual meeting.

156. Miller was required to participate despite the religious conflict she had disclosed, imposing harm on the conditions under which she performed her work.

157. The Coalition failed to reasonably accommodate the identified religious practice.

158. Miller's claim concerns the refusal to address that actual conflict, not a general right to avoid training, refuse lawful job duties, or deny services to any protected group.

159. The failure to accommodate directly caused Miller emotional distress and injury to her working conditions.

160. Miller seeks the remedies legally available for those injuries without duplicative recovery under Count I.

**COUNT IV — RETALIATION FOR OPPOSING RELIGIOUS DISCRIMINATION**
**Title VII, 42 U.S.C. § 2000e-3(a)**

161. Miller incorporates the preceding factual allegations.

162. Miller opposed conduct she reasonably and in good faith believed was religious discrimination and religious harassment.

163. Miller's opposition included an email dated October 30, 2024 in which she refuted the claim that her faith prevented her from serving families and subsequent conversations with HR and senior management about religious targeting and isolation.

164. Miller continued seeking relief during 2025.

165. Miller's October 15, 2025 grievance and October 16 follow-up requests followed the religiously specific complaints described above.

166. Miller's retaliation claim relies on management's knowledge of those religious complaints, not on ordinary workload disagreements alone.

167. The Coalition knew of Miller's opposition through the supervisors and HR personnel receiving the complaints, Winfield's briefings to Scheetz, and Scheetz's acknowledgment that she knew of the situations and had seen the file.

168. The Coalition terminated Miller on October 17, 2025, two days after she filed a formal grievance against her direct supervisor and one day after her repeated requests for protection during an investigation into that grievance.

169. Miller's termination was materially adverse and would dissuade a reasonable employee from reporting discrimination.

170. Management's religiously framed pressure for Miller to abandon her complaints, its handling of Miller's renewed grievance, the timing of the termination, recent performance praise, and the differing explanations to the EEOC regarding Miller's termination support the inference that Miller's protected opposition was a but-for cause of the termination.

171. The Coalition would not have terminated her when it did absent Miller's opposition to religious discrimination.

172. The Coalition thereby violated Title VII's prohibition on retaliation and directly caused Miller's economic and other injuries.

**COUNT V — RETALIATION FOR OPPOSING RACIAL HARASSMENT**
**Title VII, 42 U.S.C. § 2000e-3(a)**

173. Miller incorporates the preceding factual allegations.

174. Miller engaged in protected opposition by reporting the racial-slur text and by notifying Beard on August 12, 2025 about the racial connotations of the monkey displayed at her supervisor's cubicle.

175. The reports expressly concerned race, rather than a general complaint of unfairness.

176. Miller's belief that the conduct implicated racial harassment was sincere and reasonable in light of her receipt of an incendiary racial slur sent to her work device, the later display of a stuffed monkey in her workspace, and the circumstances she reported.

177. Alyasiry filed a grievance against Miller in response to Miller's report of racial harassment.

178. HR then investigated Miller's statements and temporarily changed her reporting relationship.

179. Miller thereafter experienced continued scrutiny and exclusion and was ultimately terminated by managers who knew of her opposition to racial harassment in the workplace.

180. Miller's complaint-triggered grievance, the subsequent treatment, the decisionmakers' knowledge of Miller's continuing complaints, and the termination circumstances support an inference of intentional retaliation.

181. Miller's opposition to racial harassment was a but-for cause of her termination; absent that opposition, the Coalition would not have terminated her when it did.

182. Miller's termination was materially adverse and directly caused her injuries, in violation of 42 U.S.C. § 2000e-3(a).

**COUNT VI — RETALIATION FOR ASSERTING RACE-EQUALITY RIGHTS IN EMPLOYMENT**
**42 U.S.C. § 1981**

183. Miller incorporates the preceding factual allegations.

184. Miller's compensated employment relationship with the Coalition was protected by 42 U.S.C. § 1981, including its performance, terms and conditions, and termination.

185. Miller sought to protect her right, and the rights of Black co-workers, to work without racial harassment by reporting the racial-slur text and the racial connotations of the monkey display.

186. Miller's complaint expressly identified this racial concern and was directed to senior management.

187. The Coalition knew of Miller's opposition to being subjected to racial harassment in the workplace.

188. Alyasiry's grievance followed and objected to Miller making such report of racial harassment.

189. HR investigated Miller's race-related statements, and the managers involved in the ensuing complaints knew of Miller's protected activity before her termination.

190. The Coalition intentionally retaliated against Miller by terminating her employment.

191. Alyasiry's grievance filed in response to Miller's report, the subsequent course of treatment, and the separation circumstances provide the factual basis for inferring retaliatory intent.

192. But for Miller's race-related opposition, the Coalition would not have terminated her employment when it did.

193. The retaliation impaired the performance and continuation of Miller's employment relationship and caused the economic and other injuries alleged.

194. This count concerns retaliation for asserting race-equality rights, not religious discrimination under § 1981.

195. Miller seeks the relief legally available under § 1981 without a double recovery for the same injury.

## PRAYER FOR RELIEF

WHEREFORE, Miller requests judgment against the Coalition and the following relief, to the extent available for each proven claim:

A. Back pay, lost compensation, and employment-related benefits actually lost because of the unlawful conduct, subject to legally required offsets and mitigation;

B. Front pay in lieu of reinstatement to the extent warranted by the evidence and applicable law;

C. Compensatory damages for emotional distress, humiliation, mental anguish, and other proven compensable losses;

D. Punitive damages on claims permitting such relief, based on the Coalition's intentional conduct and malice or reckless indifference to Miller's federally protected rights, as established by the evidence;

E. Reasonable attorney's fees and taxable costs under the applicable civil-rights fee-shifting provisions;

F. Prejudgment and post-judgment interest as permitted by law; and

G. Such other relief as the Court determines is just and available, without duplicative recovery for the same injury.

Date: November 23, 2026

Respectfully submitted,

**SIWEL LAW LLC**

By: */s/ L. Michelle Lewis*
L. Michelle Lewis, #74335MO
P.O. Box 23042
Belleville, Illinois 62223
Telephone: (730) 274-0136
lmlewis@siwellaw.com

ATTORNEY FOR PLAINTIFF